Charles William KUNC, Cynthia A. Kunc, Lilly Kunc, Christine Kunc Kratky, Frank Kratky, Cecelia Kunc Presley, Anton Matt Kunc, Pearl Kunc, Plaintiffs in Error,

v.

HARPER–TURNER OIL COMPANY, a Corporation, Defendant in Error.

No. 36739.

Supreme Court of Oklahoma.

April 3, 1956.

Rehearing Denied May 22, 1956.

LeRoy A. Powers, John H. Cantrell, Oklahoma City, for plaintiffs in error.

Robinson, Shipp, Robertson & Barnes, Coleman Hayes, Oklahoma City, for defendant in error.

HALLEY, Justice.

Parties will be referred to as they appeared in the trial court.

Plaintiffs owned the West Half of Section 33, 14N, 2W, in Oklahoma County covered by an oil and gas lease executed by them February 10, 1941, for a term of five years on Producers 88 Form to Black Oak Oil Company, and later assigned to the defendant. The lease had a special provision that it would become void unless the lessee commenced the drilling of a well on either the East Half of Section 32 or the West Half of Section 33, within six months from the date of the lease to a sufficient depth to test all Pennsylvanian Sand, unless oil or gas in paying quantities was found at a lesser depth.

In August, 1941, the lessee completed a producing oil and gas well in the center of the NW SW NW of Section 33, and in February, 1943, a second well was drilled in the center of NE SW of Section 33, but was a dry hole and abandoned.

On June 6, 1946, the lessee obtained an order of the Corporation Commission holding that the lease should be divided into well spacing units of 40 acres each, but this order did not include the SW¼ of Section 33. No further wells were drilled on this lease and on August 9, 1948, plaintiffs made a written demand that defendant commence the drilling of additional wells within 60 days or a suit to cancel the lease would be filed.

November 26, 1948, this action was filed by plaintiffs alleging that defendant had failed to diligently develop the lease and prayed that the lease be deemed cancelled and forfeited. Defendant answered generally denying the allegations of plaintiffs and alleged that a reasonably prudent operator, under existing circumstances would not have drilled additional wells and that current exploration in the general area would give additional geological information and offered to drill additional wells whenever conditions justified.

On January 5, 1950, a hearing was had and a demurrer by defendant was overruled, and the demurrer was renewed on March

8, 1950, and the court found that no judgment should be entered at that time, but that the matter be continued indefinitely to be reset at any time after six months from that date.

No further action appears to have been taken for more than two years, when on July 16, 1952, the plaintiffs filed an application for further hearing and prayed that the matter be set for hearing and for a determination of the issues raised by the pleadings.

November 18, 1952, the plaintiffs sent a notice to the defendant stating that defendant had forfeited their lease and demanded that it release the lease of record and that any physical encroachment or entry upon the undeveloped portion of the land covered by the lease would be considered a trespass.

Plaintiffs filed a supplemental petition alleging that on November 17, 1952, defendant had illegally entered upon plaintiffs' land and started preparation for the commencement of drilling, but that such entry was a trespass. They prayed that the lease be decreed abandoned and terminated, forfeited and cancelled by operation of law; that the defendant was estopped, that it was a trespasser and that it be enjoined from continuing to trespass upon plaintiffs' land. They also prayed that defendant be enjoined and restrained from entering upon or occupying the undeveloped portion of the lease. Damages were asked for failure to develop diligently the leasehold estate. On demurrer the court held such damages not recoverable in addition to the other relief sought. Defendant pleaded the 10th paragraph of the lease providing that if lessee should be judicially determined obligated to drill a well or wells, they should have 90 days in which to commence such well or wells. Defendant also pleaded the Corporation Commission's order creating a Bartlesville Sand Unit containing the West Half of the NW¼ of Section 33 and attached a copy of such order to its answer.

Plaintiffs replied that the unitization of part of the lease here involved was not to their benefit but caused them loss of royalty and revenue and asserted that defendant cannot rely upon the express terms of the lease because the lease had expired and had been abandoned by the defendant.

March 2, 1954, a hearing was had and the case taken under advisement until April 28, 1954, on which date the court made findings of fact and conclusions of law in substance as follows:

That lessee drilled the first well at a cost of $22,133.43 in 1941, to the Bartlesville Sand horizon to a depth of about 5,817 feet which has continued to produce; that in October, 1950, the Corporation Commission entered an order creating the East Edmond South Field Bartlesville Sand Unit, including the West Half of the NW¼ of Section 33, but not the remainder of the West Half of Section 33; that the owners of the minerals have participated in the oil and gas production from such sand unit and have been receiving royalty therefrom since 1941.

That no delay rentals have been paid by defendant since completing the first producing well and that in March, 1943, defendant drilled a well on the NE¼ of SW¼ of Section 33 to a depth of 6020 feet but it was plugged as a dry hole.

During 1952 and 1953, the defendant continued to explore for oil and gas in the area West and South of the lease in question and in November, 1952, drilled a well three-quarters of a mile South of plaintiffs' lease and found the tight Bartlesville Sand productive of gas but not deemed commercial but were thereby led to believe that such sand might be productive South of the first well drilled on plaintiffs' lease and began operations there to commence a well in November, 1952.

That plaintiffs learned that such well was about to be drilled and notified defendant that they considered their lease abandoned and expired except as to the West Half of the NW¼. This new well was spudded in November 21, 1952, and completed as a producer in the Bartlesville Sand December 24, 1952. The cost of this well was $38,-138.48, and produced about 30 barrels of oil per day.

Two or possibly three locations in the West Half of Section 33 may be productive, one directly South and one a diagonal offset in the NE of the SE¼ of Section 33.

The Corporation Commission in June, 1946, at the instance of defendant established a 40 acre drilling and spacing unit North and West of plaintiffs' land as a Bartlesville common source of supply, fixed generally as North of the East West center line of Section 33.

The court found that no productive well had been drilled as a direct offset to plaintiffs' land except the J. Kunc No. 1 in the center of SE¼ of the NE¼ of Section 32 which was completed after the first well on plaintiffs' land.

He found that there had been no drainage from plaintiffs' land by wells on adjacent tracts; and that no physical abandonment of any portion of their leasehold had occurred and that defendant never intended to abandon any portion of the lease here involved.

That defendant has at all times continued a general study of the area and has drilled on plaintiffs' land within a reasonable time after developments in the general area indicated that a well would probably produce in paying quantities, and that other portions of plaintiffs' land may in the future be proven commercially productive in the Bartlesville or some other formation.

Also the Bartlesville sand throughout the area is irregular, spotty and unpredictable, rendering an operator liable to substantial risk of financial loss on any well drilled, making it advisable to proceed cautiously in developing the area and that the defendant has not acted in this respect in disregard of the rights of plaintiffs.

The court concluded that no portion of defendant's lease has been abandoned; no act or failure to act by defendant constitutes an election to abandon the lease or any part thereof; that no principle of equity required the court to declare that the lease has expired to any portion of plaintiffs' land or to determine that defendant is estopped to deny the expiration or lapse of the lease.

Judgment in accord with the above findings and conclusions was entered for the defendant and plaintiffs have appealed.

It is first contended that the unitization of the portion of the land covered by a lease with other lands created two separate leasehold estates and that production from a unit containing only a portion of the leased land does not extend the primary term of the lease as to that part outside the drilling unit.

In creating the units here the Corporation Commission acted under statutory authority and must be assumed to have acted within the law, in the absence of any showing to the contrary. The Supreme Court of Louisiana in Hunter Co., Inc., v. Shell Oil Co., Inc., 211 La. 893, 31 So.2d 10, held contrary to this view and that such action by the Corporation Commission did not divide the lease into two separate leasehold estates. In the case before us the lessee had obtained production during the primary term of the lease.

The Circuit Court of Appeals in Gregg v. Harper-Turner Oil Co., 10 Cir., 199 F.2d 1, held that where a portion of a leasehold estate is placed in a drilling unit, the other portion of the unit did not lapse while there was production on the unitized portion.

The same holding has been approved in Buchanan v. Sinclair Oil & Gas Co., 5 Cir., 218 F.2d 436, and cases cited therein. Again in Trawick v. Castleberry, Okl., 275 P.2d 292, 293, the cancellation of part of a lease not included in the communitization agreement was prayed for. The District Court of Lincoln County cancelled that portion of the lease outside the unit. The court said in part as follows:

"The primary question for our determination is: when only part of the lands covered by an oil and gas lease are included in a communitized area, and production is had therefrom and payments made thereon, is such production sufficient to extend the primary term of the lease contract as to the portion not communitized?

"Pursuant to the plain terms of the lease contract above quoted, we must conclude that it is."

In quoting with approval from Godfrey v. McArthur, 186 Okl. 144, 96 P.2d 322, the court said:

" 'Where an oil and gas lease upon land located in Oklahoma City provides that the same shall remain in force as

long as oil or gas is produced from the leased premises, and thereafter by order of the city authorities a portion of said land is annexed to a drilling block and production is had from said block and is participated in by the lessor, the lease on the entire tract therein described will be preserved throughout the period of such production, subject to the covenants contained in the lease.'"

While we are cited no Oklahoma cases involving the exact state of facts as in the case before us, the cases cited above involve the same principle. We think the pooling by the Corporation Commission does not have the effect of creating two separate leasehold estates and that unitization of a portion of a lease with other lands does not affect the terms of the lease, whether production is from the portion of the unit from the lease under consideration or from another portion of the unit.

It is also contended that a portion of the leased land never occupied or developed by the lessee is abandoned, where by acts and omissions, the lessee shows an intention to abandon.

One dry hole and two producing wells had been drilled on plaintiffs' lease at the time of the trial. A witness for lessee testified positively that the lessee had never intended to abandon the lease. Abandonment is a factual question. The case of Frick-Reid Supply Corp. v. Meers, Tex.Civ. App., 52 S.W.2d 115, 119, is cited and in which it is said in quoting from Summers on Oil and Gas, Section 162, as follows:

"'Forfeiture is the exercise of an expressly reserved power by the lessor to terminate the lease for breach of the lessee's express or implied duties. Abandonment, on the other hand, denotes a power in the lessee, by his acts or failure to act, to establish a legal intention on his part to relinquish his interest thereby creating a power in the lessor, upon proper proof of this intention, to enforce a cancellation of the lease in equity. * * * They are different, however, in that the power to terminate the lease by forfeiture is ex-

pressly created by the lease, while the power of the lessor to terminate the lease by abandonment is created by the words or conduct of the lessee. Termination by abandonment is voluntary on the part of the lessee in the sense that he may control his own conduct; that is, his failure to reasonably test and develop the land, from which the lessor's power to terminate had its inception. Forfeiture and abandonment may appear to be alike, in that the enforcement in equity of the lessor's power to terminate by either process necessarily involves the proof of breach of the lessee's express or implied covenants to test or develop. * * *'"

In Magnolia Petroleum Co. v. St. Louis-San Francisco Ry. Co., 194 Okl. 435, 152 P.2d 367, 368, it is said in the sixth paragraph of the syllabus:

"The burden of proof rests upon one seeking cancellation of a portion of an oil and gas lease on the theory of abandonment to establish physical relinquishment and an intention to abandon."

Again in Pohlemann v. Stephens Pet. Co., 197 F.2d 134, 137, the Tenth Circuit Court of Appeals said:

"In Oklahoma the doctrine of abandonment is applied only in cases where an intention to abandon is accompanied by physical relinquishment. An expressed intention not to drill until conditions change is not indicative of an intent to abandon, but rather an assertion of reliance upon the prudent operator rule."

In Carter Oil Co. v. Mitchell, 10 Cir., 100 F.2d 945, 951, it is said:

"To constitute abandonment there must be an intention on the part of the lessee to relinquish the leased premises or some portion thereof. The earlier Oklahoma cases held that to constitute abandonment there must be a concurrence of an unequivocal intention to abandon and actual relinquishment of the premises. * * *"

We must conclude that the lease has not been abandoned and there is cer-

tainly no evidence supporting an intention to abandon or that defendant has physically relinquished the lease.

Plaintiffs call our attention to the present trend of judicial decisions which lean toward the rule of "drill or release" that portion of a lease not developed, and contrary to the reasonably prudent operator rule to the effect that a lessee does not forfeit his lease for failing to develop where additional wells would probably not result in profit.

■ While plaintiffs announced at the opening of the trial that they were relying upon abandonment rather than the reasonably prudent operator rule, there is much argument based upon the latter. It has been held that where there has been an unreasonable length of time between the last well drilled and an action to have lease cancelled for failure to drill, the lessee has been required to assume the burden of proof to justify delay. We think this rule is fair and just when coupled with the rule that the lessee should have notice and demand for further development and have a reasonable time to commence operation before an action to cancel the lease is commenced.

In Hudspeth v. Schmelzer, 182 Okl. 416, 77 P.2d 1123, 1125, it is said in the body of the opinion:

"The defendants further contend that the duty of the lessee to diligently proceed with the drilling of the well, if any such duty exists, rests upon an implied rather than an express covenant, and that the judgment should be reversed because no demand to comply with the implied covenant was made. The lease contained no express stipulation regarding due diligence, so it may be conceded that such covenant is implied herein. Summers on Oil & Gas, § 134. * * *". (Other cases cited.)

This Oklahoma rule was also stressed in Sadler v. Public National Bank and Trust Company of New York, 10 Cir., 172 F.2d 870, 875, wherein it was announced:

"But here no notice was given. All that Sadler did was make a written demand that the lease be released of rec-ord. Such demand did not take the place of the required notice of demand to develop. * * *"

■ The above rule is well established. The notice given to the lessee on November 18, 1952, in the case before us simply notified the defendant that it had forfeited and allowed to lapse and abandoned the lease and demanded that it be released of record and that any entry or operation upon the land would constitute a trespass and that plaintiffs would seek recovery of damages arising therefrom.

This notice certainly does not constitute notice to further develop, but in fact forbids any further effort in that direction. In Gypsy Oil Co. v. Champlin, 163 Okl. 226, 22 P.2d 102, 103, the court said:

"The defendant contends that plaintiff is not entitled to equitable relief. In support of this contention plaintiff cites the case of Wapa Oil & Development Co. v. McBride, 84 Okl. 184, 201 P. 984, on page 987, wherein it is said: 'The general rule as gathered from the different cases may be stated that, before the lessor is entitled to declare a forfeiture for failure to comply with implied covenants, for failure to drill offset wells, he must notify the lessee and demand that the lessee comply with the implied covenants. This is nothing more than equitable.'"

Again in Colpitt v. Tull, 204 Okl. 289, 228 P.2d 1000, 1003, the rule is announced as follows:

"The second proposition is that in order to invoke the doctrine of implied covenant to drill additional wells there must be a demand to fulfill the requirements of the implied covenant, and that lessor cannot maintain an action for the breach thereof unless the lessee has been given reasonable notice to fulfill the requirements. In this case the evidence clearly shows reasonable notice. * * *"

■ The rule is well established that where lessors seek the cancellation of a lease on the ground that it has not been properly developed, the lessors must give

notice that they demand the drilling of an additional well or wells and that failure to comply by the lessee will result in an action to declare the undeveloped portion of the lease forfeited and cancelled, and that the lessee is entitled to a reasonable time after such notice to commence operations to comply with the notice and demand.

▮ The order of the District Court entered March 9, 1950, contains the following language:

"It Is, Therefore, Ordered and Adjudged that this cause be stricken from the docket and the further hearing or trial hereof be indefinitely continued to be reset before the court and further heard at any time following six months from the date hereof and upon the application of either party, with proper notice to the attorneys for the adverse party."

Plaintiffs contend that the above order constitutes an alternative decree under which the lessee was given a period of six months to elect to either develop or release and that failure to develop and having established a drilling unit excluding the undeveloped portion of the leased land, constituted an election to allow the lease to lapse and expire as to the undeveloped acreage and that having so elected the lessee is estopped to deny expiration and abandonment of the lease.

Prior to the entry of the above quoted order of March 9, 1950, the court found that during the argument plaintiffs requested the court to retain jurisdiction in order that equity might be done, and the court found that "* * * no order or judgment should be entered at this time * * *", but that the court should retain jurisdiction and that the case be stricken and continued indefinitely to be reset for further hearing at any time after the expiration of six months upon the request of either party.

The surrounding area of this lease was being explored and this would furnish valuable geological information as to the probability of commercial production on the undeveloped portion of the lease involved. We do not find that the above order constituted an alternative decree requiring the lessee to drill or surrender the lease within six months, or that the failure to drill constituted an election to surrender the lease or constituted an abandonment thereof.

▮ We find that the order clearly shows that it was merely a postponement for further hearing at the request of either party. There is no explanation as to why plaintiffs allowed almost two years to elapse before requesting further action by the court and only then after the defendant had begun operations to drill another well. Failure of the lessee to act within six months did not constitute an abandonment, and we find no ground for equitable estoppel by reason of failure of lessee to commence operations for further development during the period immediately after the six months period expired, in the absence of a demand for further hearing by plaintiffs.

During the time from the date of the lease in 1941, to the date this action was tried, the lessee had drilled a total of some 54 wells in the general reservoir of which this lease is a part. At the hearing on January 5, 1950, a consulting geologist who had recommended the drilling of the first well and had watched the development of the common source of supply at all times testified that the sand encountered was very erratic, sometimes producing one or two barrels per day and sometimes 50 barrels per day. He had recommended the location and drilling of all wells drilled by the lessee in that area and testified that if an operator was required to drill on each 40 acres in this area he would likely "go broke."

Other qualified witnesses testified that the lessee had developed the lease in a prudent manner. A careful review of the evidence and all of the facts and circumstances surrounding the development of the lease involved convinces us that the trial court reached a fair and equitable conclusion in finding for the defendant lessee and the judgment is affirmed.

JOHNSON, C. J., WILLIAMS, V. C. J., and DAVISON and JACKSON, JJ., concur.

BLACKBIRD, J., dissents.